# FONTANO v. ROBBINS.*

---

BUILDING CONTRACTS; ARCHITECTS, GENERAL POWERS OF.

1. Although a contract for interior marble work in a church, which provides that the work shall be commenced when the walls are up and the roof on and that the owner shall provide all labor and materials not included in the contract in such manner as not to delay the progress of the work, and in the event of failure so to do, thereby causing loss to the contractor, that the owner will re-imburse the contractor for such loss, also provides that the work shall be done under the direction and to the satisfaction of the owner's architects, the architects under such a contract have no power to change the contract without the consent of the contractor and require him to proceed with the work before the walls are up and the roof on.
2. Where a building contract does not so provide, an architect is not the general agent of the owner and has no power to change the plans of the work, and especially not to the detriment of the contractor.
3. Where a building contract provides that the contractor under the direction and to the satisfaction of the architects will provide all of the materials and perform all of the work mentioned in the specifications and drawings made by the architects and made parts of the contract, such provisions mean only such supervision and direction by the architects looking to the execution and completion of the work according to the plans and specifications as may be proper to be given to effect that end. Such provision makes it the duty of the architect to see that the contract is complied with, not violated.
4. *Fontano* v. *Robbins*, 18 App. D. C. 402, followed.

No. 1287.    Submitted April 22, 1903.    Decided June 25, 1903.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia upon the verdict of a jury in an action of covenant upon a building contract.    *Reversed.*

---

*See *Fontano* v. *Robbins*, 18 App. D. C. 402.

The COURT in the opinion stated the case as follows:

This case has been in this court on a former appeal taken by the present appellant, Primo Fontano, who was the plaintiff in the court below. *Fontano* v. *Robbins,* 18 App. D. C. 402. The former appeal was taken from the ruling of the court below, directing a verdict for the defendant, upon the evidence produced for the plaintiff, and without hearing evidence for the defendant. That ruling was reversed by this court, and the cause was remanded for a new trial. Upon the second trial, after the evidence had been given for both plaintiff and defendant, the case was again taken from the jury, upon the supposed ground of defect of evidence to entitle the plaintiff to recover. To the granting of this instruction at the instance of the defendant, the plaintiff excepted; and this exception presents the principal question for decision on this appeal.

·The action is one of covenant upon a contract under seal, dated August 19, 1895, and entered into between the plaintiff, Primo Fontano, of Carrara, Italy, and the defendant, then Miss Mary Helen Carroll, now Mrs. Robbins, of Maryland, for the supply and erection of certain artistic work in the interior of the church of St. Matthew, in the city of Washington, District of Columbia. The price to be paid for the work and material to be supplied and erected was $28,500, according to the contract. The action is brought to recover the sum of $3,888.10 on account of time lost and extra expenses incurred, by reason of delay, caused the plaintiff in the performance of his work and undertaking under the contract. The plaintiff's undertaking was that he would, under the direction and to the satisfaction of certain architects, provide all the materials and perform all the work shown in the drawings and specifications of said architects "for the interior marble finish of the chapel of St. Anthony of Padua, in the church of St. Matthew, Washington, D. C., including the ceiling of decorative plaster work, and the three windows of transparent alabaster,— all set up in place complete. The work was to be completed on or before October 1, 1896. Provision, however, was made for the extension of the time set for completion, upon certain events and

contingencies that might occur; among them "the neglect, delay, or default of the owner, or the architects, or of any other contractor," and so forth.

The contract between the plaintiff and defendant is very full and explicit in its provisions, and seems to have been intended to provide for all conditions and contingencies that might arise in the execution of the work. It seems to have been prepared with an especial view of not only securing the faithful execution of the work, but of protecting the rights and interests of both parties to the contract as the work progressed. Little discretion was left to either party; and careful safeguards were provided, to enable the contractor to proceed with and perform the work within the time fixed, and according to the terms of the contract. The work designed being of an interior structure and finish, it was of necessity dependent, to a large extent, upon the exterior construction of the walls and covering within which the work was to be done; and the contract carefully provides for such condition of the walls and roofing of the building as would be proper and safe for the performance of the interior work, and its protection.

The parts of the contract most materially involved in this action are contained in articles 1, 2, 3, and 8. By article 1, it is provided, that "the contractor, under the direction and to the satisfaction of Heins and Le Farge, architects, shall and will provide all the materials and perform all the work mentioned in the specifications and shown on the drawings prepared by the said architects for the interior marble finish of the chapel of St. Anthony of Padua, in the church of St. Matthew, Washington, D. C., including the ceiling of decorative plaster work, and the three windows of transparent alabaster,—all set up in place complete; which drawings and specifications are identified by the signatures of the parties hereto."

"Article 2. The architects shall furnish to the contractor such further drawings or explanations as may be necessary to detail and illustrate the work to be done, and the contractor shall conform to the same as part of this, *so far as they may be consistent with the original drawings and specifications* referred to and identified," etc.

"Article 3. No alterations shall be made in the work shown or described by the drawings and specifications, *except upon a written order of the architects,* and when so made, the value of the work added or omitted shall be computed by the architects, and the amount so ascertained shall be added to or deducted from the contract price.    In the case of dissent from such award by either party hereto, the valuation of the work added or omitted shall be referred to three disinterested arbitrators, one to be appointed by each of the parties to this contract, and the third by the two thus chosen; the decision of any two of whom shall be final and binding, and each of the parties hereto shall pay one-half of the expenses of such reference."

"Article 8. The owner agrees to provide all labor and materials not included in this contract in such manner as not to delay the material progress of the work, and in the event of failure so to do, thereby causing loss to the contractor, agrees that he will reimburse the contractor for such loss; and the contractor agrees that if he shall delay the material progress of the work so as to cause damage for which the owner shall become liable (as above stated) then he shall make good to the owner any such damages," etc.

The defense interposed was a denial of causing delay to the plaintiff in the execution of his work, and the full performance of the contract on the part of the defendant, including the full payment of the price stipulated to be paid for the work.    The case was tried upon issue joined upon this plea.

On the part of the plaintiff, it was shown in proof, that soon after the signing of the contract, he began work in Carrara on the marble, preparatory to having the same ready to be set up in the chapel, and completed within the time prescribed by the contract. That in May, 1896, about 75 cases of the marble were shipped, and arrived in Washington in June, 1896; and that practically all the marble was cut and ready to be shipped to this country in June, 1896; but owing to the fact that the plaintiff learned that, at that time, the walls of the chapel had not been completed, and the roof had not been begun, he did not forward the balance of the marble as he was about to do.    That as soon as the plain-

tiff learned of the unfinished condition of the walls and the roof of the chapel he directed his agent here to notify the defendant, or her architects, requesting them to complete the walls and roof immediately, as he was ready to put up the marble; and, accordingly, his agents notified the architects before June, 1896, and repeatedly thereafter, of the unfinished condition of the walls and roof, and of the arrival of part of the marble in this country, and of the readiness of the plaintiff to begin the setting of the same, and urged them to complete the walls and roof, but no reply was ever received from them.

It was further shown in proof, that the foundation to the main floor level of the chapel was built by the architects either in the early spring of 1896 or in 1895, and that no more work was done by the architects until they started to carry up the walls in the spring of 1897.   That in June, 1897, the walls, which were to be about 30 feet high, were up about from 10 to 12 feet, or possibly 15 feet.  Proof was given, tending to show, that if the walls had been up and the roof on in June, 1896, the plaintiff was ready and could have completed his part of the work within two or three months, and before October 1st, 1896. That the unfinished condition of the walls and roof continued, and the plaintiff, in the spring of 1897, sent his brother Cariolano to this country to urge upon the architects and the defendant the necessity of completing the walls and roof in order that he, the plaintiff, might complete his part of the contract.   That the brother arrived here early in June, 1897, and immediately went to see the architects, and informed them of the condition of the walls and roof, and told them that the chapel was not ready to receive the marble, and urged them to hasten the completion of the walls and roof, so that he could begin the setting of the marble.    That the architects told him that the chapel was not ready to receive the marble, but asked him to put up part of the marble first, and afterwards they could go on with the walls and roof. This he refused to do; and that he protested against setting his marble before the walls were up to the height required, according to the plans and specifications, and before the roof was on.   That he insisted and declared to the architects, that the marble work

was too delicate to be exposed to the weather.   That Cariolano
Fontano told the architects that he would go to Washington and
see what could be done.   That he accordingly came to Washing-
ton June 11, 1897, and examined the chapel and found the walls
up only 22 feet, and the chapel was not closed in, and the roof
not on, and the floor was two inches too high for the marble work,
according to the plans.   That he at once notified the architects
that he could not go on with the work in its then condition.
Thereupon, one of the architects came to Washington and again
requested Fontano to go on with the work, asking him to make
the risers one inch each higher, to overcome the error in the
height of the floor; that he, Fontano, told the architect that he
would do his best to go on with the marble work, and commenced
it because the architect requested him to do so.   That he put up
the pedestals under the arch at the opening into the church, and
about 21 feet lineal of wainscoting; but that he stopped work be-
cause of several thunder storms, during which the rain, beating
on the walls, came down on the marble work, staining it, and
softening the plaster in which the columns that held the marble
work in place were imbedded, and thus loosening the marble
from the fastenings.   That he again notified the architects that
it was impossible for him to go on until the walls were up and
the roof on, as the contract and specifications provided, and again
urged them to complete the walls and roof, in order that he might
go on with the work to completion.   He also testified that he saw
the defendant at Coney Island, about the end of August, 1897,
and he informed her of the delay, and of the condition of the
chapel, and requested her to hurry the work on the walls and the
roof, which work had been begun, but was going on very slowly.
That the defendant then told him that she had nothing to do with
the brick work or with the building of the walls and roof, and
therefore declined all liability for the delay, but advised the wit-
ness Fontano to go back to Italy, and wait there until the chapel
was ready for the marble work.   But witness told her that there
was no use of his going back to Italy, because his brother's capi-
tal was all sunk in this undertaking, and he would have nothing
whatever to do if he did go back, as his brother had been obliged

to refuse other offers of contracts. That after this interview with the defendant, the witness returned to Washington but was compelled to wait until the walls were up and the roof partially on. That the work of building up the walls of the chapel to the required height was begun in July or August, 1897, and as soon as the walls were up the work of putting on the roof was begun, and was completed in the autumn of 1897. That witness commenced the setting of the marble work on the 18th of October, 1897, and that it was not possible for him to commence earlier. At the time he began, for the second time, to set the marble work, the roof was not wholly completed. When he began the setting of the marble in October he found that the marble previously set by him was stained and loosened from the walls, and that the plaster between the walls was rotten, and he was compelled to take it all down.

The plaintiff himself was never in this country, but he was represented by his brother Cariolano Fontano, who, by profession, was an expert in marble and marble work. The testimony of the plaintiff himself was taken in Italy, and he testified that, by profession, he was an architect and sculptor, and that prior to December, 1900, he owned and carried on his workshop in Carrara. And, among other things, he testified that the drippings of mortar and cement on marble, and rain water filtering in the walls where there is lime and cement, stains the marble, corrodes the polish, and the water weakens the fastenings with which the marble is attached to the walls, affecting the solidity of the work; that marble can be more easily set in warm than in cold weather.

The plaintiff gave further evidence tending to show that he was delayed for about two months on account of the failure to put up the frame work for the ceiling. That he notified the architect several times in October, November, and December, 1897, and in January, 1898, of the delay in putting up the frame work for the decorative ceiling; but he did not receive the diagram of drawings of the ceiling until early in February, 1898. That the plaintiff's part of the contract, according to plans and specifications, was completed on the 15th day of March, 1898.

The plans and specifications, which were made parts of the contract, expressly provided that the outside walls would be built, the rough concrete floor finished, and the chapel roofed in when the contractor commenced to set the marble work. It was further specified and provided that all brick work supported on the columns of the chapel should be done by the owner's brickmasons at such times and in such manner as the contractor might require; the contractor should, however, keep the brickmasons under his supervision, and so arrange that they should do no damage to his finished work or materials on the ground. The contractor was required to clean, and keep clean, his marble work. And all the work was provided to be at the contractor's risk, and that he should be held responsible for any stains, spots, or marks in floors, piers, or walls.

On the part of the defendant, testimony was given by Heins, the architect, that the plaintiff could have begun his work in the early spring of 1897, and that he, Heins, directed him to do so; that he told Fontano that there was no reason why he should not go on; but Fontano said he could not go on with his work because the walls were not up and the roof was not on, as the contract provided, and that the rain would spoil his work. That Fontano started to do some of the work and afterwards stopped, and that witness could never get a satisfactory reply as to his reasons for stopping; but that Fontano said something about the work that he had done having been damaged in some way. That witness notified Fontano in writing to proceed with the work, but that he refused to go on until the walls were up and the roof on, as the contract provided. After Fontano refused to go ahead with the work, witness started the carrying up of the walls to the height required by the contract, and also the putting on the roof. And the defendant introduced evidence further to show that the marble work could have been done without the roof being on, provided the plaintiff had protected his marble; and that he could have protected his work by wrapping it with burlaps and excelsior, and boxing it in, or by putting over it a canvas roof; but the setting up of the marble in this way would be more expensive than if the roof was on; and that, with this protection, the plain-

tiff could have proceeded, with fair safety, but, said the witness, "there are always chances of accidents happening whenever you put up constructive works." That had plaintiff gone to work before the roof was on, his marble might have been stained, and it might have been broken, unless the marble was protected. The architect Heins said to C. Fontano verbally that he would allow him the difference between the protection which he would have to put on the marble if the roof were on, as compared with what it would have to be if he went on without the roof; but the offer was not satisfactory, and Fontano refused to go on with the work. The architect Heins admitted that the direction given by him to Fontano to go on with the work before the walls were up or the roof was on was not in accordance with the contract, or the original plans and specifications; and "was not according to the original intention of the parties." The architect, moreover, had never notified the plaintiff or his agent that he had changed the original drawings, and designed the two walls to go up together and be bound together, and he never had in fact made such change in the drawings; but he says he had notified de Vieche, since deceased, of his intention in that respect.

In the course of the examination of this witness he was asked by counsel for the defendant this question: "What was the extent of your authority as representing Mrs. Robbins to superintend the erection and construction of this building, the work that Fontano contracted to do, and what was your authority to vary or alter or modify the form of construction and the time and manner of construction?" This was rather a remarkable question, in view of the very specific contract between the parties, and it was objected to by the plaintiff. But the objection was overruled by the court, and the witness was allowed to answer; and in the answer he said: "I had the usual authority of an architect. I was supposed to have charge of the work. I am supposed to direct the contractors when to begin and how to do their work, the order in which they shall do it, and when to start and when to stop." The plaintiff excepted to the question and the right to have it answered.

There were other facts and circumstances given in evidence, but they are not material to be noticed in this connection.

At the close of the evidence on both sides, the defendant prayed the court to instruct the jury that, under the pleadings and all the evidence in the case, the plaintiff was not entitled to recover, and that instruction was granted, and the plaintiff excepted. The verdict and judgment being for the defendant the plaintiff has appealed.

*Mr. Benjamin S. Minor* for the appellant.

*Mr. George E. Hamilton* and *Mr. M. J. Colbert,* for the appellee:

1. Under the ruling of the court below that it would be competent for the plaintiff to show that the marble-work could not have been proceeded with with safety, no testimony of that nature was offered and none was attempted to be introduced, so that at the conclusion of all the evidence the only question was as to the reasonableness of the architect's direction, and the only testimony upon that subject was the testimony of the architects, Heins and Taylor, both of whom declared that under the changed conditions it was reasonable, practicable, and proper to do the work in the manner that Mr. Heins had ordered it to be done.

Primo Fontano in his deposition states that the only things that prevented the execution of his contract before the roof was on were "the danger of storms and the conditions of the contract and specifications."

Cariolano Fontano testified that "the marble was too delicate to be exposed to the weather;" that he started to do the work, but the rain-storms stained the marble and softened the plaster. When asked why he did not put a temporary roof over his work he stated that he did not look into that matter, because he stood upon his contract, and again on the same page he states that it was not possible for him to do the work as directed by the architect "under the terms of his contract." So that the proof is uncontradicted that Fontano could have done the work as directed by Mr. Heins, but that he preferred to stand on the terms of his contract.

2. While it may be conceded that an architect has no power generally to make alterations in the plans and specifications so as to bind his employer for extra work, or to make any changes in the original contract, it is contended that if he is authorized to use his own discretion and judgment as to the means to reach a certain end, he may vary the terms of the contract. 2 A. & E. Enc. Law (2d ed.) P. 821; *Robinson* v. *Springfield Iron Co.* 39 Hun, 634.

Heins himself testified that he had authority to direct the contractors when to begin and how to do their work, the order in which they should do it, when to start and when to stop, and there is absolutely no contradiction of this proof. So that it must be assumed that in directing Fontano to proceed with his work before the roof was on, Heins had the complete authorization of his principal, and indeed Mr. Fontano never questioned the extent of Heins' authority when the order was given. Counsel for the appellant confuses the contract between Mrs. Robbins and her agent with the contract between Mrs. Robbins and Fontano. It was entirely competent to show the extent of Heins' authority, and such a showing did not in any degree vary or alter or add to the terms of the contract between Mrs. Robbins and Fontano.

In addition to this, the contract itself provided in article 3 that the architect should have the authority to make alterations in the work, and if such alterations required the contractor to do additional work he should receive additional compensation for it. The contractor himself agreed that he would perform any additional work or any alterations in the work that the architect might direct upon receiving proper compensation.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

The plaintiff has assigned three errors, for which he asks the reversal of the judgment:

1. That it was error to take the case from the jury, in view of all the evidence before them.

2. That it was error to hold as matter of law that the architect

had the power and authority under the contract sued on, or by
virtue of his employment as such, with the usual powers as archi-
tect, to change and materially to depart from the express provi-
sions of the contract without the consent of and against the pro-
test of the plaintiff, in directing and requiring the plaintiff to
proceed with the setting of the marble work in the chapel, before
the enclosing walls were up and the roof on the chapel, as re-
quired by the contract.

3. That the court erred in admitting parol evidence to vary,
add to, or modify the terms and provisions of the written con-
tract sued on.

1. With respect to the first assignment of error, we do not per-
ceive that the case is materially changed from what it was when
here on the former appeal, so far as the right of the plaintiff to
have the case passed upon by the jury is concerned. On the
first trial the case was taken from the jury, and that was held
by this court to have been error, and the judgment was reversed
and the cause remanded for retrial. It is true, the defendant's
evidence contained in the present record was not then before us;
but there is nothing in the defendant's evidence, as now dis-
closed, that rendered it proper to take the case from the jury on
the last trial, any more than on the former trial. On both trials,
there was evidence that should have been submitted to the jury.

The learned justice below seems to have been of opinion that
the architect had paramount authority over the contract and the
work to be done under it, and that he could change and vary the
contract and the plans and specifications of the work as he
thought proper; and this appears to have been the opinion of the
architect also, as to the extent of his powers. The justice below
seems to have thought that because the plaintiff did not proceed
with the execution of the work as directed by the architect, be-
fore the erection of the exterior walls and putting on the roof, as
required by the contract, he can have no right to recover for any
delays that may have occurred, in violation of the terms of the
contract, no matter how damaging such delays may have
been to the plaintiff. That such was the view of the jus-
tice below seems clear from the opinion expressed by him,

which has been furnished us in the brief of the appellee. It is there said: "There is no fact about it so far as this issue is concerned, for the order is shown to be a lawful order, such as an architect could make. That I held upon the argument yesterday, unless it could be shown by some proper evidence, exterior, that it was an unreasonable order and ought not to have been made, or that it was so unreasonable as that it would be presumed not to be in contemplation of the parties at the time they drew up the contract and specifications. But that does not seem, from the evidence, to be the fact, and when we come to that conclusion we have disposed of every question of fact there is in the case. The fact of the plaintiff having been idle for a certain length of time, of his being put to expense by having an agent here, and a man here who was brought over to assist in the work, is shown, under such circumstances, to be the result of his own conduct. He refused to go on under the direction of the architect and unless he could go on in the way originally provided in the contract, which would be with the walls up and the roof on. There could be, in his estimation, no change made, and unless that condition of things was brought about he would not go on with his work. In doing that I think he assumed the responsibility, and it can not be referred to any fault on the part of the defendant in this case. It is the result of his refusal to do anything until he could do it in exactly the way the original contract provided, ignoring the order of the architect. There is where the whole trouble seems to have arisen."

Upon such a construction of the contract it would afford the plaintiff, the contractor, little or no protection, and all power would reside in the architect to change and modify the terms of the contract at his will and pleasure. If he can dispense with one provision of the contract, made manifestly for the protection of the contractor, he could dispense with any other material provision, or as many others as he might think proper, and the rights secured by contract would thus become subordinate to the will and pleasure of the architect. This was clearly never contemplated by the contracting parties. Indeed, the very terms of the contract forbid it.

It is not pretended that there was any supplemental contract made by the parties; nor is it shown that there were any such alterations made in the work described in the drawings and specifications, by the written order of the architect, as would seem to be contemplated by the terms of article 3 of the contract. Such alterations could only be made in respect to some minor details in the plan of the work as shown and described by the drawings and specifications, but not as to the manner and conditions under which the work was to be performed. The architect himself has given us his idea of the source and extent of his authority under the contract. He says: "I had the usual authority of the architect. I was supposed to have charge of the work. I am supposed to direct the contractors when to begin and how to do their work, the order in which they shall do it, and when to start and when to stop." A very large power, certainly; and he makes no exception in respect to the terms of the contract, nor of the special nature and character of the work to be done. But whatever this architect may think of the nature and extent of his authority, we suppose it to be competent to the parties contracting in respect to the work to be done, and the manner and conditions under which it shall be executed, to determine for themselves the conditions under which the work may or can be done, and thus exclude the power of the architect, and to place the conditions under which the work shall be done beyond his control. That, we think, was done by the contract sued on in this case.

The general or usual powers of an architect are not, by any means, of an unlimited character. Building contracts generally make the architect the agent of the owner in the matter of deciding whether the work done is according to the requirements of the drawings and specifications. But, apart from an agreement to that effect, an architect is not the general agent of the owner, and has no power to change plans of the work, and especially not to the detriment of the contractor. He cannot change the terms of the contract, and either omit or insert provisions that the parties have not agreed to, unless expressly authorized by the parties. The terms of the contract, that the contractor, under the

direction and to the satisfaction of the architects, will provide all the materials and perform all the work mentioned in the specifications and drawings, made by the architects, and made parts of the contract, only mean such supervision and direction, looking to the execution and completion of the work according to plans and specifications, as may be proper to be given to effect that end. Such provision makes it the duty of the architect to see that the contract is complied with, not violated. The authorities in support of this proposition are clear and numerous. *Leverone* v. *Arancio,* 179 Mass. 439, 61 N. E. 46; *Adlard* v. *Muldoon,* 45 Ill. 194; *Burke* v. *Kansas,* 34 Mo. App. 570; *McIntosh* v. *Hastings,* 156 Mass. 344, 31 N. E. 288; *Stewart* v. *Cambridge,* 125 Mass. 102; *Glacius* v. *Black,* 50 N. Y. 145, 10 Am. Rep. 449. See cases collected in 2 Am. & Eng. Enc. Law, 2d ed. p. 820.

It follows from what we have said that the judgment appealed from must be reversed, and the cause be remanded that another trial be had; and it is so ordered.

*Judgment reversed and cause remanded.*